DE COTEAU, et al., Appellant

v.

DISTRICT COUNTY COURT FOR THE
TENTH JUDICIAL DISTRICT, Respondent

(211 N.W.2d 843)

(File No. 11200. Opinion filed October 31, 1973)

Bertram F. Hirsch, New York, New York, for petitioner and appellant.

Thomas R. Vickerman, Asst. Atty. Gen., Pierre, for defendant and respondent; Kermit A. Sande, Atty. Gen., Robert Krogstad, Sp. Asst. Atty. Gen., Pierre, on the brief.

DOYLE, Justice.

This is an appeal from the judgment of the Circuit Court of Roberts County denying appellant's petition for a Writ of Habeas Corpus to release her two children from the custodial process of the district county court.

The essential facts are undisputed. Appellant, Cheryl Spider DeCoteau, is the mother of Robert Lee Feather and Herbert John Spider. All are members of the Sisseton-Wahpeton Sioux Tribe. The youngest child, Robert, was given up for adoption by his mother on March 12, 1971. The older child was placed in a foster home by the county court after neglect and dependency proceedings were initiated by the Welfare Department. Both children are in foster home care at present by order of the county court of August 4, 1972.

It was stipulated by the parties that approximately fifty percent of the acts or omissions giving rise to the county court orders occurred on federal trust lands, and approximately fifty percent of said acts or omissions occurred on non-Indian patented lands, all within the exterior boundaries of the Lake Traverse Reservation, as originally established by the Treaty of February 19, 1867. 15 Stat. 505.

The appellant's petition for a Writ of Habeas Corpus challenged the jurisdiction of the state court. Whether the state court had jurisdiction depends on whether the non-Indian patented lands, where a portion of the acts or omissions occurred, are within "Indian Country".

In 1948 Congress enacted a statutory definition of what constitutes "Indian Country":

"Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." Act of June 25, 1948, c. 645, 62 Stat. 757, as amended 18 U.S.C.A. § 1151 (1970).

■ If the non-Indian patented lands (situs) involved in the present case are within this definition of "Indian Country" then the state courts of South Dakota have no jurisdiction, for the law is established that state jurisdiction does not extend to Indians in "Indian Country". Williams v. Lee, 1959, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251; State of Arizona ex rel. Merrill v. Turtle, 1969, 9 Cir., 413 F.2d 683; Iron Crow v. Oglala Sioux Tribe of Pine Ridge Res., 1956, 8 Cir., 231 F.2d 89; United States ex rel. Condon v. Erickson, D.C.S.D., 344 F.Supp. 777; Smith v. Temple, 82 S.D. 650, 152 N.W.2d 547; State v. Molash, 1972, 86 S.D. 558, 199 N.W.2d 591.

■ Numerous cases regarding state jurisdiction over Indians have been before this court and we have consistently held that if the reservation is disestablished by Congressional action and the situs of the act or crime is located on the portion of the reservation so dissolved, then the state courts have jurisdiction. Application of DeMarrias, 1958, 77 S.D. 294, 91 N.W.2d 480; State v. DeMarrias, 1961, 79 S.D. 1, 107 N.W.2d 255, cert. den., 368 U.S. 844, 82 S.Ct. 72, 7 L.Ed.2d 42; DeMarrias v. State of South Dakota, 1962, D.C.S.D., 206 F.Supp. 549; DeMarrias v. State of South Dakota, 1963, 8 Cir., 319 F.2d 845; State ex rel. Hollow Horn Bear v. Jameson, 1959, 77 S.D. 527, 95 N.W.2d 181; Wood v. Jameson, 1964, 81 S.D. 12, 130 N.W.2d 95.

In order to determine whether the non-Indian patented lands (situs) are in "Indian Country", it is necessary to review the history of the "Lake Traverse Reservation", now commonly known as the "Sisseton-Wahpeton Indian Reservation", and all applicable legislation pertaining thereto.

In 1867, the United States, by treaty, set aside a permanent reservation for the Sisseton and Wahpeton Bands. Treaty of February 19, 1867, 15 Stat. 505, ratified April 15, 1867, Proclamation May 2, 1867:

> "Beginning at the head of Lake Travers[e], and thence along the treaty line of the treaty of 1851 to Kampeska lake; thence in a direct line to Reipan or the northeast point of the Coteau des Prairie[s], and thence passing north of Skunk lake, on the most direct line to the foot of Lake Traverse, and thence along the treaty line of 1851 to the place of beginning."

On December 12, 1889, an "Agreement" was entered into between the United States Government and the Sisseton and Wahpeton Bands of the Dakota or Sioux Indians, Act of March 3, 1891, 26 Stat. 989, at 1036, whereby the Indians:

> "hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation set apart to said bands of Indians as aforesaid remaining after the allotments and additional allotments provided for in article four of this agreement shall have been made."

This agreement further provided that the United States would pay to the Sisseton and Wahpeton Bands of Indians the sum of two dollars and fifty cents per acre for every acre thus ceded, sold, relinquished, and conveyed to the United States. It was agreed by the parties that this sum of money, with interest to accrue, would be held in the Treasury of the United States for the sole use and benefit of the Indians.

■ By the very terms of this agreement, the Sisseton and Wahpeton Bands of Indians sold their unallotted lands, and the United States Government paid a sum certain for each and every acre purchased. The money was deposited in the United States Treasury and the United States agreed to pay interest thereon. All the money was to be used for the sole benefit of the Indians. This, then, was an outright cession and sale of lands by the Indians to the United States. The land sold was separated from the reservation by Congress and became part of the public domain.* In this agreement the United States did not contract to act as trustee to sell the land for the Indians and credit the proceeds to the tribe. The government agreed to purchase the land outright. Therefore, the tribal title was extinguished and the reservation disestablished. The unallotted lands so sold are no longer in "Indian Country".

Appellant contends that the purpose of the Act of 1891 was to make surplus lands available to settlers. There was nothing stated in the original Agreement of 1889 about settlers purchasing or moving to the unallotted land bought by the United States Government. The Act of 1891, ratifying the Agreement of 1889, contained a section pertaining to settlers. Section 30 states:

"That the lands by said agreement ceded, sold, relinquished, and conveyed to the United States shall immediately, upon the payment to the parties entitled thereto of their share of the funds made immediately available by this act, and upon the completion of the allotments as provided for in said agreement, be subject only to entry and settlement under the homestead and townsite laws of the United States, excepting the six-

---

* South Dakota was admitted into the Union as a State on the express condition that its people do "agree and declare that they forever disclaim all right and title to * * * all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States * * *." Enabling Act of February 22, 1889, 25 Stat. 676, Vol. 1, SDCL p. 183, Art. XXII of our Constitution.

teenth and thirty-sixth sections of said lands, which shall be reserved for common school purposes, and be subject to the laws of the State wherein located * * * ."

The Act of 1891, including this section, has been construed to mean that the lands so ceded and sold would be subject to the laws of the State of South Dakota. Application of DeMarrias, supra. In DeMarrias v. State of South Dakota, 1962, D.C.S.D., 206 F.Supp. 549, the court stated:

"The said Acts of 1889 and 1891 and the President's Proclamation, supra, constitute explicit manifestations as of the effective dates thereof of an intent by the Congress to restore to the public domain all unallotted lands within the Lake Traverse Reservation which were being opened for entry and settlement under the homestead and townsite laws of the United States and to make those areas subject to the laws of South Dakota."

On appeal the Eighth Circuit, United States Court of Appeals, approved the United States District Court's "carefully considered opinion" and affirmed "the trial court's well-reasoned opinion". DeMarrias v. State of South Dakota, 1963, 8 Cir., 319 F.2d 845. We agree with these cases. Since the lands had been sold to the United States by the Indians, the United States Government could provide the terms by which this land would be settled and sold, and also provide what jurisdiction would be established for these lands.

Appellant contends that the reasoning in the cases of Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346, and City of New Town, North Dakota v. United States, 1972, 8 Cir., 454 F.2d 121, should apply to the case before this court. In our opinion these cases do not apply as they interpret a completely different type of Act than the Act of 1891 herein involved, which is a sale and cession Act of Congress disestablishing a portion of the Sisseton and Wahpeton Reservation.

Where the language of a statute is plain and unambig-

uous, there is no occasion for construction. Phelps v. Life Benefit, Inc., 67 S.D. 276, 291 N.W. 919; see generally, 50 Am.Jur., Statutes, § 225.

We conclude that the Act of 1891 disestablished that part of the Sisseton and Wahpeton Indian Reservation embracing the non-Indian patented land and that the trial court correctly found that the district county court had jurisdiction over the appellant for the acts or omissions that occurred in "non-Indian Country".

Affirmed.

All the Justices concur.